U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2017 JUN -1 AM 10: 49

CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

JOSEPH MONTAGNO,          )
                         )
        Plaintiff,        )
                         )
    v.                    )          Case No. 2:16-cv-232
                         )
CITY OF BURLINGTON,       )
                         )
        Defendant.        )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS
(Doc. 9)

Plaintiff Joseph Montagno brings this action pursuant to 42 U.S.C. § 1983 and Vermont state law against Defendant City of Burlington (the "City"), alleging that the City maintains a "caller punishment policy" through which it acted in concert with his landlord to violate Plaintiff's First, Fifth, and Fourteenth Amendment rights under the United States Constitution, as well as Plaintiff's rights under state law.

On November 4, 2016, the City moved to dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction and pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted. Plaintiff opposes the motion. After oral argument on February 8, 2017, the court took the motion under advisement.

James M. Diaz, Esq. and Lia N. Ernst, Esq. represent Plaintiff. Pietro J. Lynn, Esq. and Sean M. Toohey, Esq. represent the City.

## I.    The Complaint.

### A.    The City's Alleged "Caller Punishment Policy."

On March 15, 2013, Plaintiff signed a written one year lease with Sisters and Brothers Investment Group ("S&B") for an apartment located at 184 Church Street in Burlington, Vermont. Plaintiff's initial lease term expired on February 28, 2014. He

subsequently renewed his lease for one year terms in 2014, 2015, and 2016. During his tenancy at 184 Church Street, Plaintiff allegedly contacted the Burlington Police Department ("BPD") on numerous occasions regarding "threatening and hazardous conduct, and other potentially criminal or hazardous occurrences, he experienced in and around 184 Church Street." (Doc. 1 at 8, ¶ 49.)

Plaintiff alleges that the City has a "policy, practice, and/or custom" of punishing Burlington tenants whom the City "unilaterally and arbitrarily deems to have requested BPD assistance too frequently." *Id.* at 1; *id.* at 6, ¶ 34. Plaintiff further asserts that the City enforces this "policy" by: (1) tracking the number of calls for BPD assistance from tenants; (2) arbitrarily classifying as a "public nuisance" any tenant deemed to call BPD too frequently; (3) pressuring landlords to silence, threaten to evict, or evict "public nuisance" tenants; and (4) failing to provide tenants with notice or an opportunity to challenge the City's arbitrary actions. *Id.* at 6-7, ¶¶ 35-43 (internal quotation marks omitted).

Plaintiff alleges that on or about January 16, 2016, "[a]s a direct result of the [City's] Caller Punishment Policy," S&B informed Plaintiff that it was terminating his lease for "no cause" effective March 31, 2016. *Id.* at 7, ¶ 47 (internal quotation marks omitted); *id.* at 14, ¶ 102 (internal quotation marks omitted). S&B then proceeded to initiate eviction proceedings against him. Due to the City's "caller punishment policy," Plaintiff alleges that S&B refused to withdraw its eviction action against him unless he agreed to modify his lease so that it terminated six months prior to its expiration date.

## B. The "Minimum Housing Standards Ordinance of the City of Burlington."

The "Minimum Housing Standards Ordinance of the City of Burlington" (the "Housing Code" or "HC") was in effect at all times relevant to Plaintiff's Complaint.[1] It

---

[1] Plaintiff did not attach a copy of the Housing Code to his Complaint; however, because his Complaint relies on, cites to, and quotes extensively from the Housing Code which is attached to the City's motion to dismiss (Doc. 9-2), the document is properly before the court. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) ("A complaint 'is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference" and even if "a document is not incorporated by reference, the

2

provides that an "owner of a rental unit . . . shall not rent, offer for rent[,] or allow any person to occupy any dwelling or dwelling unit without a certificate of compliance[.]" HC § 18-18(a).[2] If an owner fails to comply with the Housing Code, the owner's certificate of compliance "for one (1) or more rental unit(s) may be suspended for up to one (1) year. . . [if] the fault for noncompliance is determined to rest with the landlord, not the tenant(s)." HC § 18-20(a). Suspensions may also result from the following circumstances:

(1)    The occurrence of at least five (5) violations of any applicable city or state ordinance or law within a particular rental unit within an eighteen (18) month period which have not been rectified within the period of time allowed by the enforcement officer;

(2)    The occurrence of at least two (2) major violations of any applicable city or state ordinance or law within a particular rental unit within an eighteen (18) month period which have not been rectified within the time allowed by the enforcement officer;

(3)    If the rental unit has been adjudicated to be a public nuisance since receipt of the certificate of compliance; or

(4)    The occurrence on the property of at least three (3) adjudicated public nuisance type violations, including but not limited to, excessive and unreasonable noise, public urination, or discharge of fireworks, firearms[,] or airgun, within a twelve (12)-month period if the landlord has not taken prompt and appropriate remedial action as determined by the enforcement officer based on the severity of the violations. Appropriate remedial action may mean a warning letter, a notice of termination[,] or a filing of an ejectment action as determined appropriate by the enforcement officer. Action will be considered prompt if it is taken within seven (7) days from notification by the city to the landlord or agent. A suspension issued pursuant to this subsection . . . shall apply to the entire rental property notwithstanding anything to the contrary herein.

court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint.") (internal quotation marks omitted).

[2] "Owner" is defined as "any person who, alone, jointly[,] or severally with others, holds legal or equitable title to any dwelling, roominghouse, dwelling unit[,] or rooming unit." HC § 18-2. "Rental unit" means "any structure, a part of which is rented out and occupied as a residence by another, for compensation, including duplex units, so called. The portion of any such unit being occupied as a residence by the owner shall be considered a rental unit." *Id.*

HC § 18-20(a)(1)-(4).

An owner's certificate of compliance may be revoked "for the remainder of its term but in no case for a period of less than one (1) year for failure to comply with the requirements of [§ 18-20(b)] and the fault for noncompliance is determined to rest with the landlord, not the tenant(s)" in the following circumstances:

(1)     More than one (1) suspension within eighteen (18) months;

(2)     The failure to correct a violation for which a suspension occurs later than forty-five (45) days after suspension;

(3)     The failure to immediately commence the correction of a life threatening violation, or to immediately put in place the interim protections ordered by the enforcement officer in order to preserve health, safety[,] and welfare of those endangered by said violation; or

(4)     To fail to complete the correction of a life threatening violation within the time frame specified by the enforcement officer.

HC § 18-20(b)(1)-(4).

The Housing Code affords certain protections for tenants in the event of a suspension or revocation of their landlord's certificate of compliance:

*Protection of tenants during suspension/revocation.* If, in the judgment of the enforcement officer, it is necessary for the tenants of a rental unit to be relocated during the effectiveness of any suspension/revocation ordered pursuant to this chapter the owner shall be financially responsible for the cost of such relocation and for any additional rental costs necessarily incurred by the displaced tenants in order to secure comparable replacement housing which meets code requirements during the term of such suspension/revocation. The relocation services specified in Section 18-28 shall become applicable in such circumstances. In the event that the owner fails to meet its obligations under this subsection, such services may be provided by the city which shall thereupon be regarded as having a lien on the property to the extent of the monetary value of the services rendered by the city and shall be enforced within the time and in the manner provided for the collection of taxes on land.

HC § 18-20(c).

4

## C. The City's Alleged Enforcement Action.

Plaintiff alleges that on August 28, 2015, BPD Officer Philip Tremblay emailed BPD Crime Analyst Connor Brooks and requested the creation of a spreadsheet of BPD contacts with 184 Church Street since May 1, 2015. BPD Lieutenant Matthew Sullivan was copied on this email. In response, on September 1, 2015, Mr. Brooks sent both Officer Tremblay and Lieutenant Sullivan a spreadsheet identifying calls from 184 Church Street tenants to BPD, including the name of each tenant involved in each call, regardless of whether he or she was the caller. Plaintiff's name was included in this list. The spreadsheet described the subject matter of the calls between May 1 and August 31, 2015 as "mental health issues, suspicious events, threats/harassment, ordinance violations, disturbances, general calls for assistance, drug sales, disorderly conduct, intoxication, vandalism, compliance checks, assault, larceny, welfare checks, domestic disturbances, violations of conditions of release, . . . or drug overdoses." (Doc. 1 at 9, ¶ 57.)

On or about September 4, 2015, Lieutenant Sullivan asked Director of Burlington Code Enforcement William Ward to review the spreadsheet to determine if there was a "code angle" that could be used to "reduce calls" coming from tenants of 184 Church Street. *Id.* at 9, ¶¶ 55-56 (internal quotation marks omitted). On December 22, 2015, BPD Community Affairs Liaison Lacey-Ann Smith emailed Director Ward an updated spreadsheet, which indicated call type, call date/time, call duration, and the names and addresses of the callers. The spreadsheet also included "internal BPD server internet links to BPD incident reports for each call[,]" which allowed Director Ward to access the related BPD incident reports. *Id.* at 9-10, ¶¶ 60-61. Director Ward responded that he "definitely [could] work on it" and advised that he planned to send a letter to S&B regarding the tenants' calls for BPD assistance. *Id.* at 10, ¶ 63. Ms. Smith, in turn, stated that she would inform BPD Chief Brandon del Pozo of this plan. Thereafter, on several occasions in 2015 and in January of 2016, Ms. Smith contacted S&B and requested that S&B take action to eliminate or to reduce the calls from 184 Church Street tenants for BPD assistance.

5

On February 4, 2016, Director Ward sent the following letter to S&B's representative, Joseph Handy:

RE: 184 Church Street

Dear Mr. Handy:

I am writing to notify you that your property at 184 Church Street has been identified as a problem property based on police calls for service and Code Enforcement complaints. Problem properties are generally identified as any property where several incidents requiring city intervention occur within a designated time frame.

The Burlington Police Department has recorded over 140 incidents at 184 Church Street between January 1, 2015 and December 31, 2015. The Code Enforcement Department has 7 documented incidents at this property over the same period. The police calls for service include general disturbances, noise disturbances, disorderly conduct, intoxication incidents, trespassing, vandalism, simple assault, [and] aggravated assault, among others.

It is important to note that if arrests are made or tickets are issued, the property owner of a nuisance property could be subject to additional consequences. Burlington City ordinance provides for suspension of an owner's rental certificate of compliance for one year after the occurrence of a specific number of violations which are not addressed promptly. The full text of the ordinance is on the back side of this letter.

I am setting up a meeting at the Burlington Police Department next week to discuss the details of the complaints with you and learn what remedial action steps you intend to take. The problem property team and I will be meeting between noon and 4 p.m. on Friday February 12, 2016. Let me know which one hour block of time you would like to reserve to discuss your property.

(Doc. 9-1 at 1.) Director Ward informed BPD Community Affairs Officer Bonnie Beck and Ms. Smith via email that he had sent the letter to Mr. Handy, and attached a copy of his letter.

On February 12, 2016, Mr. Handy met with BPD representatives, including Ms. Smith and Director Ward, as well as other members of the "problem property team[.]" (Doc. 1 at 11, ¶¶ 73-74) (internal quotation marks omitted). Mr. Handy was informed that he was required to take action to stop or reduce the number of calls from 184 Church Street tenants for BPD assistance. In response to this request, S&B sent a letter dated

February 18, 2016 to each tenant of 184 Church Street, including Plaintiff, which stated, in relevant part: "[t]hese nuisance calls need to stop. Over the last year there [have] been over 140 calls to the BPD for the building. If people continue to call for nuisance calls we will be forced to start evicting people." *Id.* at 11, ¶ 77 (internal quotation marks omitted).

On February 25, 2016, S&B provided Ms. Smith with a copy of S&B's February 18, 2016 letter. Ms. Smith forwarded the letter to Director Ward and Ms. Beck. Neither the BPD nor the City advised S&B of any objections to its February 18, 2016 letter.

On February 19, 2016, Ms. Smith emailed Mr. Handy, copying Director Ward and Ms. Beck, regarding "frequent callers" from 184 Church Street. The email included the names of eight tenants and the number of times each tenant had called for BPD assistance in 2015 and 2016. Plaintiff was identified as having called for BPD assistance forty-two times in 2015 and four times in 2016.

Thereafter, S&B initiated an eviction proceeding against Plaintiff in Vermont Superior Court. On March 2, 2016, Director Ward contacted Mr. Handy and inquired about the date and time of the hearing on S&B's request for eviction. When he was informed that it was scheduled for March 22, 2016 at 8:30 a.m., Director Ward responded: "I just updated my calendar and will be available that day if needed." *Id.* at 15, ¶ 106 (internal quotation marks omitted). Director Ward subsequently attended the eviction hearing and offered to testify against Plaintiff.

On March 11, 2016, Director Ward emailed S&B regarding the "one month check-in regarding . . . attempts at remedial action at 184 Church Street." *Id.* at 12-13, ¶ 88 (internal quotation marks omitted). He noted that calls for BPD assistance from 184 Church Street tenants had not stopped since the February 12, 2016 meeting and advised that he would "make a referral of the property to the City Attorney's office" to suspend S&B's certificate of compliance. *Id.* at 13, ¶ 90 (internal quotation marks omitted). Director Ward also stated that S&B should "take more direct action" to reduce the number of calls for BPD assistance because the "volume of calls is unreasonable and

a nuisance to the neighboring properties." *Id.* at 13, ¶ 91 (internal quotation marks omitted).

One week later, on March 18, 2016, Director Ward contacted the City Attorney's Office, Chief del Pozo, and the Mayor's Office, recommending suspension of S&B's certificate of compliance for 184 Church Street based on the number of BPD calls from Plaintiff and other tenants. On March 21, 2016, Ms. Smith sent Ms. Beck and Director Ward a spreadsheet entitled "184 [C]hurch call for service breakdown 2015." *Id.* at 13, ¶ 93 (internal quotation marks omitted). The spreadsheet included Plaintiff as a source of some of the calls.

In April 2016, Plaintiff met with Mr. Handy at S&B's office where Mr. Handy informed him that the City claimed that he was calling BPD for assistance too frequently. Plaintiff denied making frivolous calls.

By letter dated April 7, 2016, the Winooski Housing Authority advised Plaintiff that it would cease making housing assistance payments to his landlord on May 1, 2016 and would terminate his federal Section 8 Housing Choice Voucher if he did not obtain another apartment by October 28, 2016. Because he was afraid of losing his Section 8 Voucher and receiving a negative reference from S&B, on May 20, 2016, Plaintiff agreed to settle the eviction action on S&B's terms, which included an early termination of his lease. Plaintiff alleges that he "suffered serious emotional and mental anguish because he . . . lost his possessory rights to his apartment" and was at risk for homelessness and the loss of his Section 8 Voucher. *Id.* at 16, ¶ 118.

On May 4, 2016, a neighbor "assaulted and threatened Plaintiff with a metal pipe" in front of the door to Plaintiff's apartment. *Id.* at 8, ¶ 50. Plaintiff alleges that this neighbor had repeatedly threatened him over the course of several months. Plaintiff asserts that due to the City's "caller punishment policy," he feared that calling BPD would result in the City taking action to "punish" him. *Id.* BPD responded to the May 4 incident, arrested the neighbor, and charged him with simple assault by menace and disorderly conduct. The neighbor was subsequently ordered to have no contact with Plaintiff and to stay at least ten feet away from him.

8

Plaintiff further asserts that he modified his conduct and refrained from calling for BPD assistance on numerous other occasions when his safety, or the safety of others, was in jeopardy. On one such occasion, Plaintiff believed there was a break-in at his apartment but refrained from calling BPD. On another occasion, Plaintiff heard neighbors threatening to shoot another person, but he again refrained from calling BPD.

### D.  Plaintiff's Claims as set Forth in his Complaint.

**Count One**: Plaintiff alleges that the City's "caller punishment policy" violated his First Amendment right to freedom of speech by threatening to impose penalties on him for requesting BPD assistance, reporting potential crimes, and making complaints.

**Count Two**: Plaintiff asserts that the City's enforcement of its "caller punishment policy" violated his First Amendment right to petition the government for assistance.

**Count Three**: Plaintiff alleges that the City violated his substantive due process rights under the Fifth and Fourteenth Amendments by arbitrarily punishing him based on his exercise of his First Amendment rights.

**Count Four**: Plaintiff asserts that, on its face and as applied, the City's Housing Code is overly broad and void for vagueness under the Fourteenth Amendment.

**Count Five**: Plaintiff alleges that the City deprived him of procedural due process by failing to provide him with notice and an opportunity to be heard.

**Count Six**: Plaintiff alleges that the City tortiously interfered with his contractual relationship with S&B in violation of Vermont law.

**Count Seven**: Plaintiff asserts that the City exceeded its authority under Vermont law by maintaining and enforcing the "caller punishment policy" in a manner designed to punish Plaintiff and others for requesting BPD assistance, and by failing to provide due process protections.

## II.  Conclusions of Law and Analysis.

### A.  Standard of Review.

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "In resolving a motion

to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint . . . as true, and draw all reasonable inferences in favor of the party asserting jurisdiction." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). "'A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists.'" *Fountain v. Karim*, 838 F.3d 129, 134 (2d Cir. 2016) (quoting *Makarova*, 201 F.3d at 113).

In adjudicating a motion to dismiss brought under Fed. R. Civ. P. 12(b)(6), the court's inquiry is "guided by '[t]wo working principles[.]'" *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). First, "a court must accept as true all of the [factual] allegations contained in a complaint[,]" a "tenet" that is, however, "inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Second, only a complaint that . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face[]' . . . survives a motion to dismiss." *Id.* at 678-79 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

"Determining whether a complaint states a plausible claim for relief will[] . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. Likewise, a court is not required to "accept as true a legal conclusion couched as a factual allegation[.]" *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 225 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

"The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

10

The district court's role "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 113 (2d Cir. 2010) (internal quotation marks omitted); *see also Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) ("The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits."). For this reason, the court does not evaluate the credibility of the Complaint's factual allegations. *See Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995) ("In considering a motion under Fed. R. Civ. P. 12(b)(6), it is not the function of the court to weigh the evidence or evaluate the credibility of witnesses").

## B. Whether Plaintiff Must Plead State Action.

As a threshold issue, the City moves to dismiss all of Plaintiff's federal constitutional claims brought under 42 U.S.C. § 1983 because Plaintiff has failed to plausibly plead "state action." Plaintiff, in turn, argues that "state action" is not required and relies on the "unconstitutional conditions doctrine."

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress[.]

42 U.S.C. § 1983.

"Unlike a state, a municipality is a person within the meaning of Section 1983[.]" *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) (internal citation omitted).[3]

---

[3] *Vives v. City of New York*, 524 F.3d 346, 350 (2d Cir. 2008) ("[U]nlike individual defendants, a municipality may not assert qualified immunity based on its good faith belief that its actions or policies are constitutional[.] . . . Thus, a municipality is liable for even its good faith constitutional violations presuming that the municipality has a policy that causes those violations.").

The governing standard for liability is set forth in *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), wherein the Supreme Court held that in order to maintain a § 1983 claim against a municipal defendant, a plaintiff must allege "action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691. The "state action doctrine" is therefore inapplicable and the City's motion to dismiss Plaintiff's federal claims for failure to plausibly allege "state action" must be DENIED.

Plaintiff fares no better with his reliance on the "unconstitutional conditions doctrine." That doctrine applies when the government conditions the receipt of a benefit on the plaintiff's forfeiture of a constitutional right.

> We have said in a variety of contexts that the government may not deny a benefit to a person because he exercises a constitutional right. . . . In so holding, we have recognized that regardless of whether the government ultimately succeeds in pressuring someone into forfeiting a constitutional right, the unconstitutional conditions doctrine forbids burdening the Constitution's enumerated rights by coercively withholding benefits from those who exercise them.

*Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586, 2594-95 (2013) (internal quotation marks omitted); *Autor v. Pritzker*, 740 F.3d 176, 183 (D.C. Cir. 2014) ("Appellants have pled a viable First Amendment unconstitutional conditions claim. That is, they allege that the government has conditioned their eligibility for the valuable benefit of ITAC membership on their willingness to limit their First Amendment right to petition government.").

In his Complaint, Plaintiff alleges he was at risk for losing his housing assistance voucher from the City of Winooski Housing Authority. He does not, however, further allege that the City of Winooski Housing Authority conditioned the continuation of his voucher on his relinquishment of First Amendment rights, nor does he claim the City of Burlington had any role in determining whether his voucher was continued. The "unconstitutional conditions doctrine" does not apply in such circumstances.

To the extent that Plaintiff argues that the City "forced S&B to choose between a significant benefit (maintaining its ability to rent 184 Church Street) and upholding Mr.

Montagno's rights at significant cost to itself (legal fees and loss of the ability to rent 184 Church Street)[,]" (Doc. 11 at 16), the "unconstitutional conditions doctrine" remains inapplicable because he alleges no constitutional right that *he* was required to forfeit in exchange for a governmental benefit that *he* would otherwise receive. Plaintiff cites no authority that would authorize him to assert a claim on his landlord's behalf, and the court has found none.

Although the parties have not briefed the applicable standard, the court nonetheless determines whether the Complaint's allegations are sufficient to state a plausible claim for relief. *See* Fed. R. Civ. P. 12(b)(6). Under *Monell*, a plaintiff must plausibly allege a causal connection between the municipality's policy or custom and a deprivation of his or her federal rights:

> As our § 1983 municipal liability jurisprudence illustrates, however, it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.
>
> Where a plaintiff claims that a particular municipal action *itself* violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward. Section 1983 itself "contains no state-of-mind requirement independent of that necessary to state a violation" of the underlying federal right. In any § 1983 suit, however, the plaintiff must establish the state of mind required to prove the underlying violation. Accordingly, proof that a municipality's legislative body or authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably. Similarly, the conclusion that the action taken or directed by the municipality or its authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains.

*Bd. of Cty. Comm'rs of Bryan Cty., Okla. v. Brown*, 520 U.S. 397, 404-05 (1997) (citation omitted). "Claims not involving an allegation that the municipal action itself

13

violated federal law, or directed or authorized the deprivation of federal rights, present much more difficult problems of proof." *Id.* at 406.

In this case, Plaintiff alleges that the City used its "caller punishment policy" and the vagueness and overbreadth of the Housing Code to pressure his landlord into initiating eviction proceedings against him. Without these municipal policies and the City's enforcement efforts, he contends that the City would have no leverage to coerce his landlord into chilling his First Amendment rights.

The City points out that Director Ward's February 4, 2016 letter allegedly threatening to suspend S&B's certificate of compliance was sent only *after* S&B notified Plaintiff that his lease would not be renewed. For pleading purposes, however, there is more than one reasonable inference to be derived from the chronology of events. Plaintiff alleges that his tenancy at 184 Church Street was routinely renewed until the City allegedly used "a code angle" to pressure his landlord to curtail Plaintiff's calls to BPD. He cites the City's emails and BPD's spreadsheets as evidence that there was a causal relationship between the City's concerns regarding the frequency of his calls for BPD assistance and S&B's decision not to renew his lease. Although there is a significant issue in this case regarding whether the City or a private party caused Plaintiff's injuries,[4] there is no requirement of "direct contact" between the City and Plaintiff provided the causal chain establishes no intervening cause. *See Brown*, 520 U.S. at 409 (requiring a plaintiff to establish "plaintiff's own injury flows from the municipality's action, rather than from some other intervening cause").

Although a close question, at the pleading stage, Plaintiff's Complaint plausibly traces his injuries of chilled First Amendment speech, early termination of his lease, and emotional distress to the City's alleged "caller punishment policy" and Housing Code as implemented by municipal employees. Dismissal of Plaintiff's § 1983 claims for failure

---

[4] Section 1983 does not provide a remedy for "merely private conduct, no matter how discriminatory or wrongful[.]" *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (internal quotation marks omitted).

to state a plausible claim of municipal involvement in the alleged constitutional violations is therefore DENIED.

### C.    Whether Plaintiff Plausibly Alleges First Amendment Claims.

In Count One, Plaintiff alleges that the City's "caller punishment policy" chills his freedom of speech to report crime and seek police assistance. In Count Two, he alleges the same policy interferes with his right to petition the government to report crime and seek police assistance. Because "[t]he Petition Clause[] . . . was inspired by the same ideals of liberty and democracy that gave us the freedoms to speak, publish, and assemble[,] [t]hese First Amendment rights are inseparable, and there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other First Amendment expressions." *McDonald v. Smith*, 472 U.S. 479, 485 (1985) (citations omitted).

The City seeks dismissal of Plaintiff's First Amendment claims, arguing that not only does Plaintiff fail to plausibly allege a "caller punishment policy" but "[a]bsent from the Complaint is any allegation that the City or its agents ever directly attempted to restrict [Plaintiff's] First Amendment rights." (Doc. 9 at 2.) Plaintiff responds that, at the pleading stage, he has alleged sufficient facts to proceed to discovery where the full extent of the City's involvement may be revealed.

"A [governmental policy or municipal ordinance] is presumptively inconsistent with the First Amendment if it imposes a . . . burden on speakers because of the content of their speech." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991). For this reason, policies "which permit the [g]overnment to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Id.* at 116 (internal quotation marks omitted).

"The First Amendment [also] guarantees 'the right of the people . . . to petition the [g]overnment for a redress of grievances.'" *McDonald*, 472 U.S. at 482. The Constitution's guarantee that this right will not be abridged is one of the "most precious of the liberties safeguarded by the Bill of Rights[.]" *BE & K Constr. Co. v. Nat'l Labor Relations Bd.*, 536 U.S. 516, 524 (2002) (internal quotation marks omitted). The First

Amendment thus protects "[t]he rights to complain to public officials and to seek . . . relief[.]" *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 194 (2d Cir. 1994); *see also Conquistador v. Hartford Police Dep't*, 2017 WL 959731, at *4 (D. Conn. Mar. 13, 2017) ("'[I]t is axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right to petition government for the redress of grievances.'") (quoting *Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004)).

Neither the City's Housing Code nor its alleged "caller punishment policy" are directed to the contents of speech, instead, they are directed to the frequency of calls for police assistance, regardless of their content. In this respect, Plaintiff's claims in Counts One and Two are more accurately characterized as a single retaliation claim for First Amendment speech.

"To establish a retaliation claim under section 1983, a plaintiff 'initially [must] show that [his] conduct was protected by the first amendment,' and that defendants' conduct was motivated by or substantially caused by his exercise of free speech[.]" *Gagliardi*, 18 F.3d at 194 (citation omitted). At the pleading state, the burden is not onerous:

> We . . . conclude that the [plaintiffs] adequately have pleaded the requisite nexus between the exercise of their First Amendment rights and subsequent retaliatory conduct by the Municipal Defendants. The ultimate question of retaliation involves a defendant's motive and intent, which are difficult to plead with specificity in a complaint. Indeed, Rule 9(b) of the Federal Rules of Civil Procedure provides that "[m]alice, intent, knowledge and other conditions of mind . . . may be averred generally." While a bald and uncorroborated allegation of retaliation might prove inadequate to withstand a motion to dismiss, it is sufficient to allege facts from which a retaliatory intent on the part of the defendants reasonably may be inferred.

*Id.* at 195 (citations omitted).

Plaintiff alleges that he called BPD to report crime and concerns for his safety and well-being. He further alleges that the City sought to reduce or eliminate his speech by tracking his calls to BPD and by using a "code angle" to pressure his landlord to reduce his calls and curtail his First Amendment protected speech. Although the right to petition

the government, even for police assistance, is not "absolute" and a "'baseless [claim] is not immunized by the First Amendment right to petition[,]'" *McDonald*, 472 U.S. at 484 (internal quotation marks omitted),[5] at the pleading stage, the court must accept as true Plaintiff's factual allegations that his calls to BPD were for legitimate purposes.

"To state a claim under Section 1983, a plaintiff must [also] allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights—in other words, there is an injury requirement to state the claim." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (internal quotation marks omitted). "[P]rivate citizens claiming retaliation for their [First Amendment speech] have been required to show that they suffered an 'actual chill' in their speech as a result." *Id.* at 645. "However, in limited contexts, other forms of harm have been accepted in place of this 'actual chilling' requirement." *Id.*; *see also LaVertu v. Town of Huntington*, 2014 WL 2475566, at *6 (E.D.N.Y. Apr. 4, 2014) ("Where a plaintiff has sufficiently alleged a concrete harm, and in the absence of a subjective chilling requirement, Second Circuit courts have only required a showing (1) that the First Amendment protected the plaintiff's conduct, and (2) that 'defendants' conduct was motivated by or substantially caused by [the plaintiff's] exercise of speech.'"); *Brink v. Muscente*, 2013 WL 5366371, at *7 (S.D.N.Y. Sept. 25, 2013) (observing that in private citizen cases, "various forms of concrete harm have been substituted for the 'actual chilling' requirement.").

Here, Plaintiff alleges that his speech was chilled by the City's "caller punishment policy" on at least two occasions when he refrained from calling BPD even though he had legitimate reasons to do so. Plaintiff further asserts that the City's "caller punishment policy" ultimately resulted in the early termination of his lease, jeopardized his Section 8 housing voucher, and caused him to fear imminent homelessness. Even in the absence of "'actual chilling[,]'" some courts have deemed similar allegations sufficient to allege a First Amendment violation. *See Zherka*, 634 F.3d at 645.

---

[5] As the City points out, courts have rejected "the notion that a city is powerless to protect its citizens from unwanted exposure to certain methods of expression which may legitimately be deemed a public nuisance." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984).

Accepting Plaintiff's factual allegations as true, he has plausibly alleged a retaliation claim under 42 U.S.C. § 1983 for his exercise of his First Amendment rights to free speech and to petition the government. The City's motion to dismiss Plaintiff's First Amendment claims as set forth in Counts One and Two is therefore DENIED.

### D. Whether Plaintiff's Substantive Due Process Claim is Duplicative of His First Amendment Claims.

In Count Three of his Complaint, Plaintiff alleges that the City's "caller punishment policy" violated his "substantive due process rights because [the City] arbitrarily punished [him] based upon his exercise of his fundamental rights to freedom of speech and to petition his government for redress of grievances." (Doc. 1 at 19, ¶ 144.) He alleges that the "caller punishment policy" does not advance any compelling government interest and is not narrowly tailored to justify infringement of his right to report potential crimes to BPD "free from arbitrary punishment." *Id.* at 20, ¶ 145.

"For a substantive due process claim to survive a Rule 12(b)(6) dismissal motion, it must allege governmental conduct that 'is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Velez v. Levy*, 401 F.3d 75, 93 (2d Cir. 2005) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). In *Albright v. Oliver*, 510 U.S. 266 (1994), the Supreme Court held that "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Id.* at 273 (internal quotation marks omitted).

Plaintiff's Fifth and Fourteenth Amendment substantive due process claims are wholly duplicative of his more particularized First Amendment claims and rely on the same "explicit textual source of constitutional protection[.]" *Id.* (internal quotation marks omitted). The Second Circuit's holding in *Velez* is directly on point:

> [T]he context that is relied upon to make the alleged actions by the defendants potentially shocking enough to sound in substantive due process, also entails, under our cases, that no such cause of action can survive defendant's motion to dismiss. What is allegedly shocking about

what the defendants[] did is either their intent to violate plaintiff's fundamental First Amendment rights, or their motive to deprive her of liberty without procedural due process. In other words, what would serve to raise defendant's actions beyond the wrongful to the unconscionable and shocking are facts which, if proven, would constitute, in themselves, specific constitutional violations. And we have held that where a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process. Because we believe that, as a matter of law, defendants' purported actions would not[,] but for the allegations of First Amendment violations, . . . be sufficiently shocking to state substantive due process claims, we conclude that plaintiff's substantive due process claim is either subsumed in her more particularized allegations, or must fail. Accordingly, we affirm the district court's dismissal of Velez's substantive due process claim against all the defendants.

*Velez*, 401 F.3d at 94 (citations omitted).

As in *Velez*, Plaintiff alleges no conduct which shocks the conscience other than the violation of his First Amendment rights. As a result, his substantive due process claim is "either subsumed in [his] more particularized allegations, or must fail." *Id.* The court therefore GRANTS the City's motion to dismiss Count Three.

E.     **Whether to Dismiss Plaintiff's Facial Challenges to the Housing Code.**

In Count Four, Plaintiff asserts that the Housing Code's certificate of compliance provisions are facially overbroad and void for vagueness under the Fourteenth Amendment to the United States Constitution because they fail to sufficiently define the terms "rectified," "violations of . . . law," "major violations of . . . law," "adjudicated public nuisance type violations," or "appropriate remedial action." (Doc. 1 at 20, ¶ 147) (internal quotation marks omitted). The City seeks dismissal of Plaintiff's facial claims, arguing that the Housing Code serves a legitimate purpose, is neither overbroad nor unduly vague, and did not cause Plaintiff's alleged injuries.

"[I]mprecise laws can be attacked on their face under two different doctrines." *City of Chicago v. Morales*, 527 U.S. 41, 52 (1999). "First, the overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the

statute's plainly legitimate sweep.'" *Id.* (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973)). "Second, even if an enactment does not reach a substantial amount of constitutionally protected conduct, it may be impermissibly vague because it fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *Id.*

"[W]here conduct and not merely speech is involved, . . . the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick*, 413 U.S. at 615. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). "[T]here must be a *realistic* danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the [c]ourt for it to be facially challenged on overbreadth grounds." *Id.* at 801 (emphasis added).

If a challenged ordinance is "readily susceptible to a narrowing construction that would make it constitutional, it will be upheld." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 397 (1988) (internal quotation marks omitted). "The overbreadth doctrine is 'strong medicine' that is used 'sparingly and only as a last resort.'" *N.Y. State Club Ass'n v. City of New York*, 487 U.S. 1, 14 (1988) (quoting *Broadrick*, 413 U.S. at 613).

An ordinance is void for vagueness if it fails to provide notice of what constitutes a violation or if it encourages discriminatory or arbitrary enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357 (1983). In *Grayned v. City of Rockford*, 408 U.S. 104 (1972), the Supreme Court explained that "[v]ague laws offend several important values":

> First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the

attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute abut(s) upon sensitive areas of basic First Amendment freedoms, it operates to inhibit the exercise of (those) freedoms.

*Grayned*, 408 U.S. at 108-09 (footnotes and internal quotation marks omitted).

"Courts have looked with disfavor on facial vagueness challenges to statutes that do not implicate fundamental rights." *Farrell v. Burke*, 449 F.3d 470, 495 (2d Cir. 2006). However,

[the] cases . . . recognize a different approach where the statute at issue purports to regulate or proscribe rights of speech or press protected by the First Amendment. Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, [a plaintiff] is permitted to raise its vagueness or unconstitutional overbreadth as applied to others. And if the law is found deficient in one of these respects, it may not be applied to him either, until and unless a satisfactory limiting construction is placed on the statute. The general rule disfavoring facial vagueness challenges does not apply in the First Amendment context.

*Id.* at 496 (citation omitted).

Because Plaintiff asserts that the Housing Code violates his First Amendment rights, he need not allege that the challenged provisions are vague in all of their applications. The Supreme Court has recently held that "our *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015).[6]

In Count Four, Plaintiff's facial overbreadth and vagueness challenges fall into two categories: (1) suspensions of a landlord's certificate of compliance for a "violation"

---

[6] *See also Farrell v. Burke*, 449 F.3d 470, 495 n.12 (2d Cir. 2006) (noting that a proponent of a facial vagueness challenge need not establish that a statute is "impermissibly vague in all of its applications" where First Amendment rights are at stake) (internal quotation marks omitted); *Johnson v. Quattlebaum*, 664 F. App'x 290, 294 n.5 (4th Cir. 2016) (noting that the "impermissibly vague *in all of its applications*" statement in *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 456 U.S. 950 (1982) has been abrogated by the Supreme Court's decision in *Johnson v. United States*, 135 S. Ct. 2551, 2561 (2015)).

or "major violation" of applicable law; and (2) suspensions for an "adjudicated public nuisance type violation."

## 1. Suspensions for Violations of Applicable Law.

"In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982) (footnote omitted). The Housing Code authorizes up to a one year suspension of an owner's certificate of compliance where "the fault for noncompliance is determined to rest with the landlord, not the tenant(s)" and:

(1)    The occurrence of at least five (5) violations of any applicable city or state ordinance or law within a particular rental unit within an eighteen (18) month period which have not been rectified within the period of time allowed by the enforcement officer;

(2)    The occurrence of at least two (2) major violations of any applicable city or state ordinance or law within a particular rental unit within an eighteen (18) month period which have not been rectified within the time allowed by the enforcement officer[.]

HC § 18-20(a)(1) & (2).

The Housing Code defines an "applicable city ordinance or state law" as falling within certain chapters and specific sections of the Housing Code. *See* HC § 18-20(h) (setting forth references to what constitutes "'any applicable city ordinance or state law'" for "purposes of" HC § 18-20). Contrary to Plaintiff's contentions, the Housing Code also defines what constitutes a "[v]iolation[,]"[7] a "[m]ajor violation[,]"[8] and a "[l]ife threatening violation[.]"[9] *See* HC § 18-20(e). While not models of clarity, each of these terms is narrowed by a requirement that the City establish a violation of applicable law

---

[7] A "violation" is defined as "[a]ny noncompliance with city or state code requirements which does not rise to the level of a major or life threatening violation[.]" HC § 18-20(e)(1).

[8] A "major violation" is defined as "[a] violation of city or state code requirements which adversely impacts the health, safety[,] or welfare of tenants, other residents of the building or the general public, but not to the extent of being life threatening, including a violation of any of the standards set forth in Section 18-19(c)." HC § 18-20(e)(2).

[9] A "life threatening violation" is defined as "[a] violation of city or state code requirements which poses an imminent threat to human life." HC § 18-20(e)(3).

22

thereby minimizing the likelihood that such provisions will be arbitrarily enforced. *See URI Student Senate v. Town of Narragansett*, 631 F.3d 1, 14 (1st Cir. 2011) ("In our view, the requirement that a violation of law be committed as a condition precedent to police intervention provides adequate guidance to ensure that the Ordinance is not arbitrarily enforced.").

As Plaintiff alleges no First Amendment right to "violate any applicable city or state ordinance or law," for purposes of his overbreadth challenge, he must "demonstrate from the text of [the Housing Code] and from actual fact that a substantial number of instances exist in which [these provisions of the ordinance] cannot be applied constitutionally." *N.Y. State Club Ass'n*, 487 U.S. at 14. His Complaint falls far short of this standard. Indeed, he does not plausibly allege *any* instance of unconstitutional application, nor is one readily conceivable. If a tenant's calls for police assistance constitute violations of applicable law (for example, disturbing the peace, disorderly conduct by telephone, or false information to a police officer), he or she would be hard pressed to argue that there is a First Amendment right to make such calls. Conversely, there is scant likelihood that a tenant will make a legitimate call for police assistance and nonetheless be deemed to have violated applicable law. Certainly, Plaintiff does not allege that he was engaged in a violation of law when he made his calls to BPD. Nor does he allege that his landlord's certificate of compliance was threatened on this basis. He therefore fails to plausibly allege that there are a "substantial number of instances" in which these provisions of the Housing Code "cannot be applied constitutionally." *Id.*

Plaintiff's facial vagueness challenge to these provisions of the Housing Code fails for similar reasons. He does not plausibly allege that the Housing Code's prohibition on violations of applicable law deter legitimate expression in a substantial number of cases. *See Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 60 (1976) (noting that a vagueness challenge may only proceed where "the statute's deterrent effect on legitimate expression" is "'both real and substantial'"). He also does not plausibly allege that the defined terms "violation" and "major violation" are so vague as to provide inadequate

23

notice of what conduct is prohibited or to give rise to arbitrary or discriminatory enforcement.

Because Plaintiff's Complaint does not plausibly allege facial overbreadth and vagueness challenges to the Housing Code's certificate of compliance provisions insofar as they address "violations" and "major violations" of "applicable city or state ordinance or law[,]" HC § 18-20(a)(1) & (2), those challenges are DISMISSED.

### 2. Suspensions for an "Adjudicated Public Nuisance Type Violation."

Plaintiff's facial overbreadth and vagueness challenges to the Housing Code's authorization of suspensions and revocations of certificates of compliance for an "adjudicated public nuisance" pose a more difficult question. Under Vermont law, a municipality may "define what constitutes a public nuisance, and . . . provide procedures and take action for its abatement or removal as the public health, safety, or welfare may require." 24 V.S.A. § 2291(14). It is not clear, however, that the Housing Code defines a "public nuisance" in a manner that avoids penalizing First Amendment speech, or in a manner that permits reasonably prudent individuals to understand what conduct is prohibited.

The Housing Code authorizes a suspension of a landlord's certificate of compliance if "the fault for noncompliance is determined to rest with the landlord, not the tenant(s)[,]" HC § 18-20(a), under the following circumstances:

* * *

(3) **If the rental unit has been adjudicated to be a public nuisance** since receipt of the certificate of compliance; or

(4) The occurrence on the property of at least three (3) **adjudicated public nuisance type violations**, including but not limited to, excessive and unreasonable noise, public urination, or discharge of fireworks, firearms[,] or airgun, within a twelve (12)-month period if the landlord has not taken prompt and appropriate remedial action as determined by the enforcement officer based on the severity of the violations. Appropriate remedial action may mean a warning letter, a notice of termination[,] or a filing of an ejectment action as determined appropriate by the enforcement officer. Action will be considered prompt if it is taken within seven (7) days from

notification by the city to the landlord or agent. A suspension issued pursuant to this subsection . . . shall apply to the entire rental property notwithstanding anything to the contrary herein.

An owner may request that the suspension be vacated and the certificate reinstated after the suspension has been in effect for at least half of its scheduled duration if the entirety of the violation(s) which resulted in the suspension has been rectified. A determination to vacate a suspension and restore the certificate shall be entirely within the discretion of the enforcement officer and there shall be no right of appeal from such determination. If an owner decides to voluntarily relinquish a certificate during the term of suspension, the relinquishment shall be for the full term of the suspension.

*Id.* (emphasis supplied).

Although Section 18-20 of the Housing Code defines "violation," "major violation," and "life threatening violation," it does not define the term "public nuisance" or "adjudicated public nuisance." The City points to City Code § 1-9(e), but that section is not definitional in nature and does not cross reference § 18-20:

General penalty; continuing violations.

(e) Public nuisances. Any property within the city found to be maintained in violation of any provisions of this code or which in any other way endangers the health, safety[,] and welfare of the residents of the city is hereby declared to be a public nuisance and may be ordered abated in any manner provided by law.

HC § 1-9(e) (Doc. 9-3 at 5-6.)

Assuming *arguendo* that § 1-9(e) applies to § 18-20, it does not actually purport to "define" a "public nuisance" but rather "declares" all code violations and anything that "endangers the health, safety[,] and welfare of the residents of the city" to be a "public nuisance." *Id.* at 6. This declaration is directed to "property" that is "maintained" in the City. An "ordinary person exercising ordinary common sense" would not "sufficiently understand" that repeated calls for police assistance may constitute a "public nuisance" under this definition. *Broadrick*, 413 U.S. at 608 (internal quotation marks omitted).

The Housing Code's requirement that the "public nuisance type violation" be "adjudicated" is not helpful in narrowing the term because it does not indicate whether the "adjudication" must be made by the Housing Board, a court, or other tribunal, or

whether a determination by the City's code enforcement officer will suffice. Although the Housing Code provides a mechanism for appealing a suspension,[10] it does not indicate that the appeal process must be exhausted before a "public nuisance" is deemed "adjudicated." In any event, while the right to an appeal a suspension is an important mechanism for reducing arbitrary and discriminatory enforcement, the Housing Code appears to leave it to the code enforcement officer's discretion to determine what constitutes a "public nuisance" in the first instance. *See* HC § 18-20(a) ("Suspensions shall be first imposed by the enforcement officer . . . If suspensions have been imposed for at least one-half (1/2) of the total number of rental units located within the property, the enforcement officer may apply the suspension of the certificate of compliance to the entire rental property.").

Finally, although facial overbreadth may be cured by a narrowing state court's interpretation,[11] it is not clear that Vermont law provides that guidance. The Vermont Supreme Court has acknowledged that "the concept of public nuisance is vague and amorphous," and a court must be "cautious to employ it in circumstances where its application might intrude in the arena of speech and expression protected by both the First and Fourteenth Amendments of the United States Constitution and the Vermont Constitution[.]" *Napro Dev. Corp. v. Town of Berlin*, 376 A.2d 342, 345 (Vt. 1977). For this reason, if First Amendment rights are at stake, the Vermont Supreme Court has held

---

[10] The City cites HC § 1-9 as governing appeals but that section pertains only to general penalties for acts which constitute violations that rise to the level of "criminal violations" and "civil offenses." The appellate process for suspensions of certificates of compliance is governed by HC §§ 18-49 through 18-59. *See* HC § 18-20(a) ("Suspensions shall be first imposed by the enforcement officer and may be appealed pursuant to Section 18-49 et seq. of this chapter"). There is no right of appeal from a code enforcement officer's decision whether to vacate a suspension. *See id.* ("A determination to vacate a suspension and restore the certificate shall be entirely within the discretion of the enforcement officer and there shall be no right of appeal from such determination.").

[11] *See Smith v. Goguen*, 415 U.S. 566, 573 (1974) (ruling that overbreadth may be cured by a state court's narrowing interpretation, however, "[w]here a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts.").

that it is generally impermissible to leave the definition of a "public nuisance" to the discretion of a governmental official or a court:

> What is encountered with the sprawling doctrine of public nuisance is an attempt to restrict First Amendment rights by means analogous to those under "a statute sweeping in a great variety of conduct under a general and indefinite characterization, and leaving to the executive and judicial branches too wide a discretion in its application."

> The common law of public nuisance may be a perfectly valid method by which to implement a state's police power in certain defined circumstances where, for example, it is used to restrain that which is prohibited by other constitutionally appropriate standards. It may not be used, however, both to define the standards of protected speech and to serve as the vehicle for its restraint.

> In the exercise of its police powers, the State has the authority to prevent or abate nuisances, subject to constitutional limitations, and the General Assembly has the authority to declare what shall be deemed nuisances and to provide for their suppression. Whatever is declared a nuisance must be so in fact, i.e., the merger of the concept in a concrete activity.

> \* \* \*

> We believe that the public nuisance law provides an extraordinary remedy for situations which truly demand one. . . . As Justice Tobriner stated in his dissent in *People ex rel. Busch v. Projection Room Theater*, "The sword of public nuisance is a blunt one, admirably designed to curb noxious odors or to quell riots, but ill[-]suited to the delicate sphere of the First Amendment where legal overkill is fatal."

*Id.* at 348-49 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)) (citation omitted).

Although the Vermont Supreme Court has not attempted to define a "public nuisance" for all circumstances, it has held that "to be considered a public nuisance, an activity must disrupt the comfort and convenience of the general public by affecting some general interest." *Id.* at 346. On this basis, it recently affirmed an adjudication of a "public nuisance" arising out of a partially destroyed, unsafe building after an evidentiary proceeding before a town's select board and a court. *See Bishop v. Town of Springfield*, 2016 WL 6562418, at \*3 (Vt. Nov. 4, 2016) (ruling that structure significantly destroyed by fire was properly designated a "public nuisance" after expert testimony from a

structural engineer). It has, however, rejected a "public nuisance" claim where the evidentiary proof was insufficient to show that the conduct in question "impact[ed] a right common to the general public." *Vermont v. Howe Cleaners, Inc.*, 2010 VT 70, ¶ 49, 188 Vt. 303, 330, 9 A.3d 276, 294 (ruling trial court properly dismissed claim because there was insufficient evidence that hazardous waste which had migrated offsite rose to the level of a "public nuisance"). These cases reveal that the determination of "public nuisance" is fact dependent and that a "vague and amorphous" definition of the term cannot be used to deprive an individual of First Amendment rights. *Napro Dev. Corp.*, 376 A.2d at 345.

Without an adequate definition of "public nuisance" to guide a code enforcement officer's discretion in enforcing the Housing Code, such a provision has the potential to be facially overbroad (by sweeping in protected conduct) and facially void for vagueness (by failing to specify what conduct is prohibited). It also presents a risk of arbitrary and discriminatory enforcement. This is because "the more important aspect of [the] vagueness doctrine is not actual notice, but . . . the requirement that a legislature establish minimal guidelines to govern law enforcement." *Kolender*, 461 U.S. at 358 (internal quotation marks omitted). For these reasons, Plaintiff has plausibly alleged that the Housing Code's use of the undefined term "adjudicated public nuisance type violation" fails to provide "sufficient guidance to eliminate the threat of arbitrary enforcement[.]" *Farrell*, 449 F.3d at 493.

The City's reliance on *URI Student Senate v. Town of Narragansett* for a contrary conclusion is misplaced. There, a State university organization, students, and landlords asserted claims against a town and town officials, alleging, among other things, that an "unruly gathering" municipal ordinance was unconstitutional on its face. The First Circuit stated that it "need not linger long" over plaintiffs' overbreadth challenge as the constitutional right of association "has never been expanded to include purely social gatherings" but is rather "contingent on the presence of underlying individual rights of expression protected by the First Amendment." *URI Student Senate*, 631 F.3d at 12.

In contrast, in this case, Plaintiff has identified a First Amendment right to petition for police assistance. *See Gagliardi*, 18 F.3d at 194 (holding First Amendment protects "[t]he rights to complain to public officials and to seek . . . relief[.]"). Plaintiff has further plausibly alleged that the Housing Code's "public nuisance" provisions have the potential to jeopardize his First Amendment speech.

With regard to the plaintiffs' facial vagueness challenge in *URI Student Senate*, the First Circuit observed that plaintiffs "bemoan[ed] the Ordinance's use of undefined terms such as 'substantial disturbance,' 'public nuisance,' and 'a significant segment of a neighborhood.'" *URI Student Senate*, 631 F.3d at 13. While acknowledging that these terms "might be problematic" if "read in a vacuum," the First Circuit concluded they were not facially vague because "[t]he Ordinance contains additional terms that supply concrete guidance as to the behavior that it prohibits and the circumstances in which it can be enforced." *Id.* at 14. The First Circuit cited the Ordinance's preamble which contained a "plainly articulated purpose" which provided "a significant contextual clue" to assist in "inform[ing] the meaning of the contested language." *Id.* at 15 (internal quotation marks omitted). In contrast, the City points to no comparable language in the Housing Code that serves a similar purpose.

More importantly, in *URI Student Senate*, the First Circuit held that the Ordinance's use of the undefined term "public nuisance" was constitutionally permissible *only because* the Ordinance required that the "public nuisance" include "conduct constituting a violation of law" meaning "some law other than the Ordinance itself." *Id.* at 14 (internal quotation marks omitted). It was this "condition precedent" that "provide[d] adequate guidance to ensure that the Ordinance is not arbitrarily enforced." *Id.* (citing *Grayned*, 408 U.S. at 112) (noting that existence of particularized enforcement context may undercut claim of vagueness). The First Circuit accordingly held that "in order to impose liability . . . the prosecution m[u]st prove that a gathering creating a substantial disturbance involving a violation of law occurred both at the time of the initial posting [of the violation sticker] and when the subsequent intervention took place." *Id.* at

15. "Police intervention at a residence is not enough, by itself, to establish an Ordinance violation." *Id.*

The challenged provisions of the Housing Code at issue in this case do not require that an "adjudicated public nuisance type violation" violate the law, let alone a law other than the Housing Code. Moreover, police intervention at a residence, without more, is apparently sufficient to establish a violation. *URI Student Senate* is thus clearly distinguishable.

Because Plaintiff plausibly alleges that the Housing Code affords inadequate notice of when First Amendment speech may give rise to an "adjudicated public nuisance type violation," and imposes inadequate limitations on when and how a code enforcement officer may make this determination, his facial overbreadth and vagueness challenges may proceed. *See* Fed. R. Civ. P. 12(b)(6). The City's motion to dismiss Count Four's facial challenges to the "adjudicated public nuisance type violation" provisions of the Housing Code must therefore be DENIED.

## F. Whether to Dismiss Plaintiff's Overbreadth and Vagueness As-Applied Challenge to the Housing Code.

Pursuant to Fed. R. Civ. P. 12(b)(1), the City moves to dismiss Plaintiff's as-applied challenges to the Housing Code on the ground that he lacks standing as the certificate of compliance provisions do not apply to him. Plaintiff counters that even though the certificate of compliance provisions are directed to landlords, he has been harmed by their overbreadth and vagueness because he has allegedly been adjudicated a "public nuisance" and "violator of the law." In Count Four he alleges:

149. Relying on the vagueness inherent in the Compliance Ordinance, the defendant arbitrarily and unilaterally alleged [Plaintiff] to have caused "adjudicated public nuisance type violations" and/or "violations of . . . law."

150. Relying on the vagueness inherent in the Compliance Ordinance, the defendant improperly pressured S&B to threaten or undertake an eviction action against [Plaintiff] for requesting BPD assistance.

151. The defendant's unconstitutionally broad and vague Compliance Ordinance prevented and prevents [Plaintiff] from knowing whether he

30

could face eviction or threats of eviction based on his requests for BPD
assistance, other constitutionally protected activity, or other conduct not
listed but potentially prohibited by the ordinance.

(Doc. 1 at 20-21, ¶¶ 149-51.)

The issue of Plaintiff's standing to bring as-applied challenges must be addressed
first because "[i]n its constitutional dimension, standing imports justiciability: whether
the plaintiff has made out a 'case or controversy' between himself and the defendant
within the meaning of Art[icle] III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "This is
the threshold question in every federal case, determining the power of the court to
entertain the suit." *Id.* "As an aspect of justiciability, the standing question is whether
the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to
warrant his invocation of federal-court jurisdiction and to justify exercise of the court's
remedial powers on his behalf." *Id.* at 498-99.

The City is correct that an indirect injury will generally not confer standing to
assert an as-applied challenge. This standard, however, is not inflexible.

> The fact that the harm to petitioners may have resulted indirectly does not
> in itself preclude standing. When a governmental prohibition or restriction
> imposed on one party causes specific harm to a third party, harm that a
> constitutional provision or statute was intended to prevent, the indirectness
> of the injury does not necessarily deprive the person harmed of standing to
> vindicate his rights. But it may make it substantially more difficult to meet
> the minimum requirement of Art[icle] III: to establish that, in fact, the
> asserted injury was the consequence of the defendants' actions, or that
> prospective relief will remove the harm.

*Id.* at 504-05 (citation omitted).

A plaintiff's burden to establish the elements of standing "increases over the
course of litigation." *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011); *see
also Bldg. & Const. Trades Council of Buffalo, N.Y. & Vicinity v. Downtown Dev., Inc.*,
448 F.3d 138, 145 (2d Cir. 2006) ("each element of standing 'must be supported in the
same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with
the manner and degree of evidence required at the successive stages of the litigation.'")
(quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Here, Plaintiff's

Complaint fails to plausibly plead standing for his as-applied overbreadth and vagueness challenges for two separate reasons.

### 1. Standing to Bring an As-Applied Overbreadth Challenge.

"Overbreadth challenges are a form of First Amendment challenge and an exception to the general rule against third-party standing." *Farrell*, 449 F.3d at 498 (citation omitted). "All overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the court." *Id.* Plaintiff's as-applied overbreadth challenge is thus included in his facial challenge to the Housing Code and does not survive as a separate claim. It is therefore DISMISSED.

### 2. Standing to Bring an As-Applied Vagueness Challenge.

"When the challenge is vagueness 'as-applied,' there is a two-part test: a court must first determine whether the statute gives the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law provides explicit standards for those who apply it." *Id.* at 486 (quoting *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993)) (internal quotation marks omitted). "Thus, all vagueness challenges—whether facial or as-applied—require [a court] to answer two separate questions: whether the statute gives adequate notice, and whether it creates a threat of arbitrary enforcement." *Id.* at 485.

For an as-applied vagueness challenge to the Housing Code's "public nuisance" provisions, Plaintiff must allege that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Where, as here, a plaintiff seeks injunctive relief, he "must also prove that the identified injury in fact presents a 'real and immediate threat of repeated injury.'" *Kreisler v. Second Ave. Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)).

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or

imminent, not conjectural or hypothetical.'" *Spokeo, Inc.*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560). An injury is "particularized" if it "affect[s] the plaintiff in a personal and individual way." *Id.* (internal quotation marks omitted). For an injury to be "concrete," "it must actually exist." *Id.* (internal quotation marks omitted).

In support of his as-applied vagueness claim, other than conclusory allegations, Plaintiff does not allege when, how, and by whom he was "adjudicated" a "public nuisance." *See Iqbal*, 556 U.S. at 678 (holding "'labels and conclusions'" insufficient to state a plausible claim for relief). At best, he alleges that the City relied on these provisions of the Housing Code in its communications with his landlord without ever applying them to Plaintiff, or suspending his landlord's certificate of compliance on that basis. Although standing may be based on "injury produced by determinative or coercive effect upon the action of someone else[,]" *Bennett v. Spear*, 520 U.S. 154, 169 (1997), as currently framed, Plaintiff's allegations regarding how the Housing Code caused his injuries remain conclusory and unparticularized. The City's motion to dismiss Plaintiff's as-applied vagueness challenge to the Housing Code in Count Four is therefore GRANTED.

### G. Whether Plaintiff's Procedural Due Process Claim Must Be Dismissed.

In Count Five, Plaintiff alleges that the City violated the Fourteenth Amendment's guarantee of procedural due process when, without affording Plaintiff notice or an opportunity to be heard, it threatened S&B's certificate of compliance. The City contends that it never compelled S&B to evict Plaintiff and, to the extent Plaintiff alleges he was denied due process in his eviction proceeding, Plaintiff's recourse was to challenge his eviction under Vermont law.

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978). "To succeed on a claim of procedural due process deprivation under the Fourteenth Amendment—that is, a lack of adequate notice and a meaningful opportunity

33

to be heard—a plaintiff must first establish that state action deprived him of a protected property interest." *Spinelli v. City of New York*, 579 F.3d 160, 168 (2d Cir. 2009).

In determining whether Plaintiff alleges a plausible violation of procedural due process, the court considers first whether he has been deprived of a protected property or liberty interest. If so, the court determines what process was due to protect that interest. *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428 (1982) ("At the outset, then, we are faced with what has become a familiar two-part inquiry: we must determine whether [plaintiff] was deprived of a protected interest, and, if so, what process was his due.").

The Supreme Court has held that constitutionally protected rights are determined by reference to "an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972); *see Golden v. City of Columbus*, 404 F.3d 950, 955 (6th Cir. 2005) (recognizing "two bases for such non-unilateral legitimate claims of entitlement: state statutes and contracts, express or implied, between the complaining citizen and the state or one of its agencies."). "Although the underlying substantive interest is created by 'an independent source such as state law,' federal constitutional law determines whether that interest rises to the level of a 'legitimate claim of entitlement' protected by the Due Process Clause." *Craft*, 436 U.S. at 9. A protected property interest "may take many forms" and "extend[s] well beyond actual ownership of real estate, chattels, or money." *Roth*, 408 U.S. at 572, 576. It must, however, have "some ascertainable monetary value[.]" *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 766 (2005) (internal quotation marks omitted).

As a leaseholder, Plaintiff had a protected property interest in his tenancy at 184 Church Street. *See* 9 V.S.A. § 4463(b) ("No landlord may directly or indirectly deny a tenant access to and possession of the tenant's rented or leased premises, except through proper judicial process."). Plaintiff concedes that he was not deprived of procedural due process in his eviction proceeding. Accordingly, his procedural due process claim cannot rest on his threatened eviction.

Plaintiff's claim that he has a right to notice and an opportunity to be heard when his behavior gives rise to a threatened suspension of his landlord's certificate of compliance, while perhaps reflecting a desirable change in the law, is insufficient to state a claim because he must show "more than an abstract need or desire for [additional notice and an opportunity to be heard]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577.

Similarly, Plaintiff cannot rest his procedural due process claim solely on the damage to his reputation because "[t]he Supreme Court has made clear that a procedural due process claim cannot rest upon reputational harm alone." *URI Student Senate*, 631 F.3d at 9 (citing *Paul v. Davis*, 424 U.S. 693, 701 (1976)). "A party who claims a violation of [his] procedural due process rights based on reputational harm must [also] show that the challenged governmental action adversely impacted some right or status previously enjoyed by [him] under substantive state or federal law." *Id.* at 10. This requirement of "stigma plus" is not satisfied by a claim that "a tenant has a right to peaceable enjoyment of a rented dwelling free from eviction[.]" *Id.* at 11.

Because Plaintiff identifies no protected property interest in the Housing Code's certificate of compliance provisions that would afford him a right to notice and an opportunity to be heard when his landlord's certificate of compliance is threatened by his alleged behavior, he fails to state a plausible claim for relief. *See* Fed. R. Civ. P. 12(b)(6). The court therefore GRANTS the City's motion to dismiss Plaintiff's procedural due process claim in Count Five.

### H. Whether to Dismiss Plaintiff's State Law Claims.

Finally, the City moves to dismiss Plaintiff's state law claims solely on the ground that this court should not exercise supplemental jurisdiction over those claims once Plaintiff's federal claims have been dismissed. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). Because the court has determined that several of Plaintiff's federal law claims may proceed, the City's

sole ground for dismissal of Plaintiff's state law claims is now moot. The City's motion to dismiss Plaintiff's state law claims is therefore DENIED.

## CONCLUSION

For the reasons stated above, the City's motion to dismiss (Doc. 9) is GRANTED IN PART and DENIED IN PART. The court DISMISSES Count Three (Substantive Due Process violation) and Count Five (Procedural Due Process violation). The court DISMISSES that portion of Count Four alleging facial and as-applied overbreadth and vagueness challenges to HC § 18-20(a)(1) & (2) permitting a suspension of a landlord's certificate of compliance for a "violation" or "major violation" of "applicable city or state ordinance or law[.]" The court also DISMISSES that portion of Count Four that sets forth Plaintiff's as-applied overbreadth and vagueness challenges to the HC § 18-20(a)(3) & (4) permitting a suspension based on an "adjudicated public nuisance type violation." All other grounds for dismissal are DENIED.

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _1st_ day of June, 2017.

Christina Reiss, Chief Judge
United States District Court